### In re POLYURETHANE FOAM ANTITRUST LITIGATION.

### Case No. 1:10 MD 2196.

United States District Court,
N.D. Ohio,
Western Division.

Feb. 25, 2014.

*MEMORANDUM OPINION AND
ORDER RE: ARBITRATION*

JACK ZOUHARY, District Judge.

Pending before this Court are two arbitration-related motions filed by Defendant Mohawk Industries, Inc. ("Mohawk"). First, Mohawk seeks to Compel Arbitration and Stay Claims of Direct Action (Non–Class) Plaintiff CAP Carpet, Inc. ("CAP Carpet") (Case No. 13–pf–10004, Doc. 24). CAP Carpet opposed the Motion (Doc. 26). Mohawk replied (Doc. 28). Second, Mohawk seeks leave to amend its Answer to the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint ("DPCAC") (Case No. 10–md–2196, Doc. 828). Direct Purchaser Plaintiffs ("Direct Purchasers," and collectively with CAP Carpet, "Plaintiffs") opposed the Motion (Doc. 865). Mohawk replied (Doc. 872). This Court heard oral argument on both Motions (Doc. 938).

\* \* \*

MOTION TO COMPEL ARBITRATION
AND STAY CLAIMS

(CASE No. 13–PF–10004, DOC. 24)

### Procedural Background

On April 11, 2013, CAP Carpet filed a Complaint in U.S. District Court for the District of Kansas, naming Mohawk as one of several Defendants (Doc. 1). CAP Carpet seeks relief under the Kansas Restraint of Trade Act (Doc. 1 at ¶ 140). The case arrived in this Court on April 29, 2013 by way of a Conditional Transfer Order (Docs. 5 & 6).

On June 10, 2013, Mohawk answered the Complaint (Doc. 15) (the "Mohawk Answer"). The Mohawk Answer included thirteen affirmative defenses (*id.* at 15–17), but not an arbitration-related defense. Instead, on October 23, 2013, Mohawk and CAP Carpet filed a "Joint Stipulation to File Amended Answer Pursuant to Federal Rule of Civil Procedure 15," six months after the filing of the Complaint and four months after Mohawk's Answer (Doc. 21). At the same time, Mohawk filed an Amended Answer, in which a fourteenth, arbitration-related defense appears (Doc. 22 at 17). Mohawk filed the present Motion on November 8, 2013. In the time between filing of the Mohawk Answer and the Amended Answer, this Court's docket reveals only two events. (1) CAP Carpet filed notice that on September 24, 2013 it had served its Federal Civil Rule 26(a) Initial Disclosures on Defendants (Doc. 19).(2) Later, CAP Carpet filed a Certificate of Service indicating that it had served on all Defendants "Responses and Objections to Defendants' First Request for Production of Documents and Things to All Plaintiffs" (Doc. 20).

This is not an isolated case though. Mohawk, along with most other Defendants named in the CAP Carpet Complaint, have been parties to this multidistrict litigation

("MDL") for three years. Along with several dozen other Direct Action proceedings, Mohawk has engaged in extensive motion practice with respect to two putative classes, including opposing two pending Motions for Class Certification (Case No. 10–md–2196, Docs. 577 & 584). Moreover, discovery in the consolidated proceedings has been extensive, and is still ongoing. Discovery protocols in this MDL provide latecomers like CAP Carpet with a substantial amount of discovery upon arriving in this Court, thanks to prior negotiations between interim Lead Counsel for the putative classes and Defendants.

### The Arbitration Agreement

Mohawk rests its asserted arbitration right on two credit agreements in which it extended credit to CAP Carpet, its customer. The first credit agreement bears a date of May 17, 1994 and the signature of Aaron Pirner, listed on the same document as CAP Carpet's then-Vice President (the "1994 Agreement") (Doc. 24–2 at 4). After sections listing general information and a bank reference, a paragraph of boilerplate text appears just above the form's signature line. Though a single paragraph appears, it is clearly structured to address four aspects of the CAP Carpet–Mohawk relationship: (1) "TERMS & CONDITIONS"; (2) "CLAIMS"; (3) "ACCEPTANCE" and; (4) "GUARANTEE." The "CLAIMS" section provides, in relevant part:

> Any controversy or claim arising out of or relating to any product delivered to the applicant or any invoice relating thereto or any breach thereof, shall, at the election of Mohawk, be settled by arbitration conducted in Atlanta, Georgia in accordance with the Commercial Arbitration Rules of the American Arbitration Association....

(*id.*). The 1994 Agreement's "GUARANTEE" section was struck out by hand.

A second credit agreement (the "1996 Agreement") followed, signed by the same CAP Carpet officer on August 19, 1996 (*id.* at 6). This form has a substantially similar structure to the 1994 Agreement. The boilerplate language varies slightly though. Now, the single boilerplate paragraph addresses (1) "TERMS & CONDITIONS"; (2) "ARBITRATION"; (3) "ACCEPTANCE" and; (4) "PERSONAL GUARANTY." Under the "ARBITRATION" Section, CAP Carpet and Mohawk agreed:

> Any payment dispute of claim arising out of or relating to any product delivered to the buyer or any invoice relating thereto or any breach thereof, shall, at the election of Seller [*i.e.,* Mohawk] be settled by binding arbitration ~~conducted in Atlanta, Georgia~~ in accordance with the Commercial Arbitration Rules of the American Arbitration Association....

(*id.*) (strikethrough original). As noted above, the parties agreed to strike out default language requiring that the arbitration occur in Atlanta. And like the 1994 Agreement, the concluding "PERSONAL GUARANTY" section is struck in its entirety, and is paired with conforming strikes in the "TERMS & CONDITIONS" and "ARBITRATION" sections to clarify that only the "Buyer" (*i.e.,* CAP Carpet), not any guarantor, made the promises included in the paragraph (*id.*).

On the reverse side of the 1996 Agreement, thirteen paragraphs recite Mohawk's "Terms and Conditions of Sale." Those terms include, among others, language disclaiming certain warranties, limiting the assignability of the buyer's orders, and providing for a method of product allocation in the event Mohawk's supply falls short of outstanding orders. The second-to-last Term provides that the "contract resulting from the acceptance of the order is to be construed ac-

cording to the laws of the State of Georgia" (*id.* at 7).

CAP Carpet and Mohawk carried on at least some business following execution of the 1996 Agreement. For instance, a February 12, 2009 Invoice reflects that CAP Carpet purchased from Mohawk a "Karastan Rug Pad" (Doc. 26–4 at 2). Further down on the same page of the Invoice, the buyer is told the Invoice is "subject to the terms and conditions on the reverse side hereof, and such terms and conditions [shall sup]ercede and control any other terms and conditions of any Dealer's Forms" (*id.*).[1] Under the heading "TERMS AND CONDITIONS," boilerplate on the Invoice's reverse side disclaims certain warranties, states compliance with the Fair Labor Standards Act, and bars the Buyer from reselling Mohawk underlay products to other dealers, rather than to end-use customers. Paragraph Four of the same page provides (*id.*):

> The Terms and Conditions hereof shall control the transaction and shall be deemed to prevail over anything inconsistent thereof with in *[sic]* any invoices[,] purchase order[,] shipping instructions, statement, notice, letter, telegram, or other communication or other written instrument or any verbal announcement or declaration on the part of or for the Buyer.

### General Legal Standard and CAP Carpet's Arguments

The Federal Arbitration Act (the "FAA") provides that "[a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A party may request an order directing that such arbitration occur. *Id.* at § 4. And "[u]pon being satisfied that" an issue is arbitrable under such a contract, this Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." *Id.* at § 3.

The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). As interpreted by the case law, the Act directs that before arbitration may be compelled or proceedings stayed this Court "must engage in a limited review to determine whether the dispute is arbitrable[,] meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir.2003). In evaluating the parties' arguments, this Court must take care that "any doubts concerning the scope of arbitrable issues [are] resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). *See also First Options of Chicago, Inc. v. Kaplan*, 514

---

1. CAP Carpet filed as an Exhibit to its Opposition what looks to be a photocopy of the original Invoice, portions of which are obscured (*i.e.*, language indicating that the terms and conditions *"shall supercede"* relevant other language). This Court supplies these omitted terms by reference to other Invoices, using the identical invoice form, submitted as part of the same Exhibit, but for which CAP Carpet did not file the Invoice's reverse side (*see* Doc. 26–4 at 4–5).

U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (noting that when parties have entered into an arbitration agreement "the parties likely gave at least some thought to the scope of arbitration" so that in light of the "the law's permissive policies in respect to arbitration, one can understand why the law would insist upon clarity before concluding that the parties did *not* want to arbitrate a related matter") (emphasis original) (citation omitted). But while there is a "liberal federal policy favoring arbitration" that requires courts to enforce arbitration agreements "according to their terms," *AT & T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011), arbitration under the FAA remains "a matter of consent, not coercion." *Albert M. Higley Co. v. N/S Corp.,* 445 F.3d 861, 863 (6th Cir. 2006) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).

■ Because arbitration agreements are matters of contract, this Court applies state law when considering the enforceability of the arbitration agreement. *Seawright v. Am. Gen. Fin. Servs. Inc.,* 507 F.3d 967, 972 (6th Cir.2007). In this case, Georgia law applies with respect to the 1996 Agreement—the terms on that Agreement's reverse side expressly provide that "[t]he contract resulting from the acceptance of the order is to be construed according to the laws of the State of Georgia" (Doc. 24–2 at 7). *See also* Doc. 24 at 6 (arguing Mohawk's terms and conditions "clearly provide that the agreement and its arbitration clause are governed by Georgia law"); Doc. 26 at 11 n. 5. CAP Carpet does not point to another body of state law that should be applied to the 1996 Agreement, and indeed cites a case applying Georgia contract law (*see* Doc. 26 at 6) (citing *Goshawk Dedicated v. Portsmouth Settlement Co. I, Inc.,* 466 F.Supp.2d 1293, 1300 (N.D.Ga.2006)). CAP Carpet does not

challenge Mohawk's arguments, raised in its Brief in Support of the present Motion, that the 1996 Agreement's arbitration clause was a valid and enforceable agreement under Georgia law when it was formed (Doc. 24–1 at 5–6).

CAP Carpet instead raises three arguments in opposition to the Motion. First, CAP Carpet contends "Mohawk waived its right to pursue arbitration" (Doc. 26 at 2–6). Second, it argues the 1996 Agreement's arbitration clause is not enforceable because subsequent transactions between the parties had the effect of rescinding the arbitration language (*id.* at 6–7). Third, CAP Carpet asserts that even if the arbitration clause has not been rescinded by subsequent transactions, the Kansas state-law claim does not fall within its scope (*id.* at 7–9).

This Court denies Mohawk's Motion to Strike (Doc. 33; *see also* CAP Carpet Oppo., Doc. 34) two additional arguments—one argument reading the arbitration clause to apply only to "claims for defective products;" the other argument discussing how actual party intent was impacted by then-federal law respecting the arbitrability of antitrust claims. Both additional arguments were raised for the first time at oral argument. But both arguments came in response to this Court's pre-hearing questions (Doc. 30).

However, the additional arguments are unavailing. The first argument is not supported by the arbitration clause's text, read in the manner required by the FAA as explained below. The second argument, discussing since—overruled circuit precedent on the arbitrability of antitrust claims, depends on a principle of Georgia contract law. That principle of Georgia contract law would conflict with the "body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate" in that it would remove from

arbitration an antitrust claim that fell within an extremely broad arbitration agreement, so long as the associated arbitration agreement was executed at a time when case law (since overruled) found antitrust claims not arbitrable. Because the FAA would deem such an antitrust claim arbitrable, and CAP Carpet's state-law-based second argument would not, the FAA's rule controls.

This Court addresses each of CAP Carpet's three primary arguments in turn.

### (1) Arbitration Waiver Analysis

CAP Carpet first argues Mohawk has waived any arbitration defense it may have had by waiting until this stage in the litigation to move for an order compelling arbitration and staying CAP Carpet's claims. CAP Carpet reaches that conclusion by discussing the six-factor waiver test articulated in *Peterson v. Shearson/Am. Express, Inc.*, 849 F.2d 464, 467–68 (10th Cir.1988). The *Peterson* test requires a court to "examine" the following factors:

(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps (e.g., taking advantage of judicial discovery procedures not available in arbitration) had taken place; and (6)

whether the delay affected, misled, or prejudiced the opposing party.

*Id.* at 467–68 (quotation markets omitted).

■ However, the Sixth Circuit applies a more abbreviated standard for resolving the waiver challenge in this case, asking whether Mohawk "waive[d] an agreement to arbitrate by engaging in two courses of conduct: (1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) delaying its assertion to such an extent that the opposing party incurs actual prejudice." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir.2012) (quotation marks omitted).[2] As the presence of the word "and" between these two relevant prongs would suggest, the *Johnson* standard is a conjunctive one, permitting a finding of waiver only when inconsistent actions are paired with actual prejudice to a plaintiff. *See id.* at 717–20 (concluding that a defendant's participation in litigation was sufficiently inconsistent with reliance on arbitration and then proceeding to consider whether plaintiff suffered actual prejudice before affirming decision denying motion to compel arbitration); *see also id.* at 719 (distinguishing another circuit's no-waiver finding by concluding the decision rested on the absence of opposing-party prejudice and not on the extent of litigation in that case); *id.* at 721 ("Because [defendant's] actions were completely inconsistent with any reliance on its right to arbitration, *and* because [its] belated assertion of that right caused plaintiffs actual prejudice in the form of unnecessary delay and expense, we hold that [defendant] waived its right to arbitration.") (emphasis added).

---

**2.** The Tenth Circuit's multifactor waiver test is substantially the same standard as that employed in this Circuit, but stated with greater specifity—that is, whether a party has filed a counterclaim would be a relevant consider-

ation under *Johnson*'s first prong. Therefore, though CAP Carpet does not apply the Sixth Circuit's preferred version of the waiver test, this Court can at least sort CAP Carpet's various arguments between the *Johnson* prongs.

In this respect, the Sixth Circuit's test differs from that employed in the Tenth Circuit, which appears to be closer to a totality-of-the-circumstances analysis. *See Reid Burton Constr., Inc. v. Carpenters Dist. Council of S. Colo.*, 614 F.2d 698, 702 (10th Cir.1980) . (surveying arbitration waiver doctrine in other circuits and identifying "relevant factors" for application in the Tenth Circuit); *see also* Doc. 26 at 6 (concluding that "[l]ooking at all of the [*Peterson* ] factors and the totality of the circumstances, Mohawk waived its right to pursue arbitration"). This Court may not "lightly infer waiver," in view of the strong federal policy favoring the enforcement of a valid arbitration agreement. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 450 (6th Cir.2005).

### Actions Completely Inconsistent with any Reliance on an Arbitration Defense

■ CAP Carpet's application of the first three *Peterson* factors are best understood as bearing on the question of whether Mohawk "t[ook] actions that are completely inconsistent with any reliance on an arbitration agreement." First, CAP Carpet argues Mohawk waived its arbitration right by failing to pursue that right "within a reasonable time after CAP Carpet filed its Complaint." Moreover, the Mohawk Answer failed to reference an arbitration defense (Doc. 26 at 3). Call this CAP Carpet's "failure-to-assert" argument. Second, CAP Carpet argues Mohawk has substantially participated in this three-year-old MDL proceeding and "demanded, and received, a fulsome document production and other discovery from CAP Carpet" (*id.* at 3–4) A "third" point largely duplicates the second, emphasizing Mohawk's claimed "extensive use of the discovery procedures available in litigation and this MDL" (*id.* at 4). CAP Carpet also notes the fact discovery deadline in the MDL ends this month. This second set of arguments is CAP Carpet's "litigation-participation" argument.

■ CAP Carpet's failure-to-assert argument must be rejected. First, it is an oversimplification of the Sixth Circuit's waiver standard to assert that failing to invoke arbitration within "a reasonable time" after filing a complaint constitutes waiver. The question to be answered is not so much whether Mohawk has delayed invoking its asserted arbitration right, but rather whether litigation machinery has been substantially invoked and prejudice resulted. Indeed, albeit in an unpublished decision, the Sixth Circuit has made the same point in examining the very district court decision that CAP Carpet cites in support of this first part of its failure-to-assert argument. *See Mantaline Corp. v. PPG Indus.*, 225 F.3d 659, at *5 (6th Cir. 2000) ("[Plaintiff] cites *Central Trust Co., N.A. v. Anemostat Prods. Div.*, 621 F.Supp. 44, 46 (S.D.Ohio 1985), for the proposition that filing a responsive pleading constitutes waiver. *Central Trust*, however, suggests that it is 'substantial participation in litigation' that is productive of the prejudice to an opposing party that warrants waiver.").

The additional components of CAP Carpet's failure-to-assert argument are more specific, in that they are tied to discrete points in time when CAP Carpet argues Mohawk should have invoked its arbitration right. But still CAP Carpet's failure-to-assert arguments are unavailing. CAP Carpet points to Mohawk's failure to oppose before the Judicial Panel on Multidistrict Litigation ("the MDL Panel") the Conditional Transfer Order ("CTO") that sent this case to this Court. CAP Carpet does not further develop this argument and, in any event, the MDL Panel has declined to vacate CTOs on the basis of arbitration where, as here with certain other Defendants' arbitration-related defenses, the question of arbitration has al-

ready been flagged before the transferee court. *See In re Checking Account Overdraft Litig.*, 659 F.Supp.2d 1363, 1363 (J.P.M.L.2009).

CAP Carpet also argues that Mohawk's failure to include an arbitration-related defense in the Mohawk Answer means that defense is waived. But there is now a Mohawk Answer in this case that includes such a defense, thanks to a party stipulation. Prior to the January 15, 2014 hearing, this Court posed a question to the parties about the events that led to CAP Carpet's agreeing to that stipulation (*see* Doc. 30 at 2). The parties provided conflicting accounts, which need not be resolved here. It appears Defense counsel did not offer the purpose of the amendment when the stipulation was sought, and Plaintiff's counsel did not ask.

In any event, the failure to include arbitration as an affirmative defense in an answer does not occlude the participation-in-litigation analysis. The *Johnson* court left open the question of whether Federal Civil Rule 8(c) employs a use-it-or-lose-it approach to pleading affirmative defenses, and only observed that "a defendant's failure to raise arbitration as an affirmative defense shows his intent to litigate rather than arbitrate." 680 F.3d at 718.

The true meat of CAP Carpet's argument appears in the litigation-participation aspects of its waiver argument. As noted, CAP Carpet emphasizes Mohawk's extensive participation in these complex proceedings. That observation is accurate. But CAP Carpet appears to confuse Mohawk's participation in *this* case with Mohawk's participation in these MDL proceedings, which involve the two putative classes. For instance, CAP Carpet asserts "Mohawk has participated in several important intervening steps in this litigation *and this MDL*" (Doc. 26 at 4) (emphasis added). True, but the key question is Mohawk's participation in CAP Carpet's

case. Likewise, CAP Carpet notes proceedings *in the MDL* are nearing the three-year mark (*id.*), but fails in this portion of its argument to note its case was pending before this Court for less than seven months when the Motion was filed. Telling, also, is CAP Carpet's failure to specifically identify any of the "motions" it claims "Mohawk *and* CAP Carpet" have "filed and responded to," nor the hearings the two parties attended together, nor the extensive written or deposition discovery that it claims has occurred in this case. CAP Carpet necessarily refers to the putative-class litigation. The fact that the putative-class litigation had been ongoing for some time when CAP Carpet brought its claim surely weakens Mohawk's position for not raising the arbitration defense earlier. However, this Court must examine Mohawk's delay in the context of prejudice to CAP Carpet. The lack of prejudice to CAP Carpet trump's Mohawk's unfortunate delay.

Mohawk paints a much less active picture of this case, one this Court credits because it fits the case's docket. Mohawk claims it has "only done three things in this case": filed an Answer; amended that Answer via stipulation; and filed and briefed the present Motion (Doc. 28 at 5). CAP Carpet, Mohawk notes, has filed no motions in this case or submitted to any depositions (*id.* at 4).

Mohawk has obtained discovery from CAP Carpet, a fact not fully reflected in this Court's docket. But that discovery was a group effort on Defendants' part. That is, Defendants jointly sought discovery from CAP Carpet in September 2013, submitting the request on behalf of a number of Defendants (*see* Doc. 28–1 at 2). Likewise, CAP Carpet docketed a notice of "Responses and Objections to Defendants' First Request for Production of Documents and Things to All Plaintiffs," listing counsel for all Defendants—not just Mo-

hawk—concerned in making the "First Request" (Doc. 20). Mohawk represents that it could have sought arbitration in this case and obtained a stay with respect to CAP Carpet's Mohawk-specific claims before September 2013, and *still* the same Defendants' discovery request would have been made (Doc. 28 at 4). This Court has no reason to doubt that assertion.

This Court cannot say this limited amount of activity constitutes "actions that are *completely* inconsistent with any reliance on an arbitration agreement." *See Johnson*, 680 F.3d at 718 (emphasis added) (concluding that a defendant who failed to include an arbitration defense in its answer, filed a breach-of-contract counterclaim, "actively scheduled and requested discovery," engaged in scheduling motions practices, and participated in court-mediated settlement discussions took actions "completely inconsistent with any reliance on its right to arbitrate").

### Actual Prejudice to CAP Carpet

 Likewise, CAP Carpet would not suffer "actual prejudice," as the case law defines that term, if compelled to submit its dispute to arbitration at this stage of the litigation. The Sixth Circuit recently explained actual prejudice has two possible forms. First, if a party seeks to submit to arbitration an issue previously decided against that party by a court, "substantive" actual prejudice exists. Second, procedural actual prejudice "can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." *Johnson Assoc. Corp.*, 680 F.3d at 719.

It is not altogether clear who bears the burden on this issue. Mohawk cites case law from other circuits placing that burden with CAP Carpet. *See, e.g., Wheeling*

*Hosp., Inc. v. Health Plan of the Upper Ohio Valley, Inc.*, 683 F.3d 577, 590 (4th Cir.2012) ("It was the plaintiffs' burden to prove the expenses they suffered as a result of [defendant's] litigation activity. Because their unsupported conclusory assertions about those expenses are insufficient to meet that burden, we cannot weigh that factor in their favor."); *Ohio–Sealy Mattress Mfg. Co. v. Kaplan*, 712 F.2d 270, 273 (7th Cir.1983). The Sixth Circuit apparently has not addressed this issue. Regardless of who bears the burden though, actual prejudice does not exist here.

For its part, in addition to pointing to the absence of motion practice (other than for the present Motion) and the case's relatively brief duration—at least as compared to the putative-class litigation—Mohawk argues CAP Carpet fails to specifically identify any expense it incurred as a result of having had to pursue this litigation during the five months that elapsed between the filing of the Mohawk Answer and the present Motion (after all, that is the relevant time frame for considering whether actual prejudice has been incurred by delay in raising the arbitration defense; in an ideal world, Mohawk would have moved to compel arbitration when it filed the Mohawk Answer). Mohawk claims CAP Carpet attended only one "Mohawk-related deposition," and asked no questions during that deposition. Moreover, Mohawk claims that whatever discovery requests CAP Carpet may have made in this case—because, again, CAP Carpet has pointed to no specific requests—would have went just as much to proving other Defendants' involvement in the alleged conspiracy as it would Mohawk's role (Doc. 28 at 8).

And for its part, CAP Carpet raises procedural prejudice arguments that Mohawk correctly labels as "conclusory."[3]

**3.** CAP Carpet does not allege that Mohawk seeks to submit to arbitration an issue previ-

ously decided against Mohawk by this Court,

In addition to failing to specifically identify any of the expense it claims it suffered as a result of Mohawk's delay in invoking its arbitration defense and confusing the litigation activities in the consolidated proceedings with this case, CAP Carpet argues "arbitration at this stage in the litigation would be inefficient and [a] colossal waste of judicial and party resources" (Doc. 26 at 4). *But see Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

Moreover, CAP Carpet's arguments related to the additional expense it would suffer from having to litigate the same general allegations in two different forums prove too much. CAP Carpet rightly lauds the centralizing, streamlining aspects of the MDL device, and its ability to "eliminate duplicate discovery, prevent inconsistent pretrial rulings, and conserve the resources of ... parties" (Doc. 26 at 4) (quoting *La. Stadium & Exposition Dist. v. Merrill Lynch,* 626 F.3d 156, 160 (2d Cir.2010)). CAP Carpet is also correct to the extent that it argues each time an MDL court (or any court, for that matter) finds a dispute to be arbitrable with respect to claims directed at only certain defendants, a plaintiff necessarily is required to litigate in more than one forum—*i.e.,* before both a federal district court and the arbiter. And yet MDL courts routinely find claims to be arbitrable. Simply put, an MDL's efficient qualities cannot alone override a party's agreement to arbitrate. This Court does not doubt that, as a practical matter, if the present Motion is granted CAP Carpet would incur additional litigation expenses. But that portion of CAP Carpet's expenses is not due to the manner in which Mohawk seeks to assert the arbitration clause; the added expense is due to the fact that CAP

Carpet has entered into an arbitration agreement with some Defendants but not with all, yet seeks recovery against all.

Because CAP Carpet does not provide "something more"—*e.g.,* a claim that Mohawk gained some strategic advantage it would not have had if this matter had been submitted to arbitration at an earlier date, *Johnson Assocs. Corp.,* 680 F.3d at 720—actual prejudice does not exist in this case.

## (2) Did Subsequent Invoices Void the Arbitration Agreement?

■ This Court must make one final detour before considering whether the present dispute falls within the terms of the arbitration clause as it appears on the 1996 Agreement. CAP Carpet argues the arbitration clause is no longer enforceable because it was superseded (Doc. 26 at 6–7). Under this view, CAP Carpet argues the "1996 [Agreement] upon which Mohawk bases its arbitration 'right' was expressly superseded by Mohawk's subsequent invoices" (*id.* at 6) Those invoices state purchases entered into between the parties are "subject to the terms and conditions on the reverse side hereof, and such terms and conditions shall supercede and control any other terms and conditions of any Dealer's Forms" (Doc. 26–4 at 2). This Court understands CAP Carpet's view of this clause's effect as being an across-the-board assertion that *no* portion of the 1996 Agreement survived the first invoice containing the allegedly superseding language. CAP Carpet goes on to argue that sending to the arbiter those claims that pre-date the superseding event, while retaining for adjudication in this Court or the transferor court those claims that post-date the superseding event, would create

and for good reason: Until today, this Court has not decided a substantive motion in this case.

"an absurd situation" and a "judicial nightmare" (*id.* at 7 n. 3).

The subsequent invoices did not supersede the 1996 Agreement's arbitration clause. Under Georgia law, for Mohawk's subsequent invoices to have superseded the 1996 Agreement in its entirety, as CAP Carpet argues, the parties must have "subsequently enter[ed] upon a *valid and inconsistent agreement completely covering the subject-matter embraced by the original contract.*" *Wallace v. Bock*, 279 Ga. 744, 620 S.E.2d 820, 822 (2005) (emphasis original). Alternatively, an arbitration agreement included in an original agreement might be "rescinded" by novation; that is, the parties might agree to enter into a subsequent contract that swaps out the original obligee with another person or firm so that, under Georgia law, the "the original contract is at an end." GA.CODE ANN. § 13–4–5.

Neither event occurred in this case. Though CAP Carpet cites case law discussing novations under Georgia law, it does not allege a novation occurred here (*see* Doc. 26 at 6) (citing *Goshawk Dedicated v. Portsmouth Settlement Co. I, Inc.*, 466 F.Supp.2d 1293, 1300 (N.D.Ga.2006)). Nor were subsequent invoices coterminous with the 1996 Agreement, such that the rule in *Wallace* would be implicated. Instead, the invoice's reverse-side "terms and conditions" are best read to correspond to that portion of the 1996 Agreement that bears the same title and addresses similar matters, and to supplant those earlier terms only to the extent they are "inconsistent with" a later invoice's terms. Because the later invoices contain no mention of arbitration, let alone discussions of arbitration inconsistent with the arbitration language that appears in the 1996 Agreement, the arbitration clause remains.

### (3) Does CAP Carpet's Claim fall within the Scope of the Arbitration Agreement?

Finally, this Court arrives at the question addressed in Mohawk's original memorandum of law in support of the present Motion: whether CAP Carpet's Kansas state-law claim falls within the scope of the arbitration clause. That inquiry begins by determining whether the 1996 Agreement's arbitration clause is "broad" or "narrow," as the case law defines those terms. A "broad" arbitration clause is, for instance, "one covering any dispute arising out of an agreement"; such a clause requires a court to "follow the presumption of arbitration and resolve doubts in favor of arbitration." *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005). That presumption requires either an express contractual clause removing a category of disputes from arbitration, or "the most forceful evidence of a purpose to exclude the claim from arbitration." *Id.* By contrast, a "narrow" arbitration clause is one that extends "by its terms ... only to a specific type of dispute." *Id.*

But even a conclusion that an arbitration clause is "broad" does not, in all cases, determine the outcome of a motion like the present one. To determine whether CAP Carpet's claims fall outside the scope of the arbitration clause, this Court must also ask "whether [it] can resolve the instant case without reference to the agreement containing the arbitration clause. If such a reference is not necessary to the resolution of a particular claim, then compelled arbitration is inappropriate, unless the intent of the parties indicates otherwise." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 814 (6th Cir.2008) (citing *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 505 (6th Cir.2007), citing, in turn, *Fazio v. Lehman Bros. Inc.*, 340 F.3d 386, 395 (6th Cir.2003)). Thus, whether the

agreement containing the arbitration clause would be involved in resolving a particular dispute is an additional factor in the scope-of-arbitration analysis when party intent is not clear. *See Nestle Waters,* 505 F.3d at 505 (declining to adopt another circuit's standard for determining the relation between a claim and the agreement containing the arbitration clause, concluding "the standard we announced in *Fazio* ... *along with* the presumption in favor of arbitrability and the intent of the parties provides sufficient guidance" on scope-of-arbitrability questions) (emphasis added).[4]

CAP Carpet argues the 1996 Agreement "narrowly limits the disputes that are arbitrable to payment disputes," citing case law that it claims finds such language to be a "narrow" arbitration clause (Doc. 26 at 8) (citing *Chelsea Family Pharm. PLLC v. Medco Health Solutions, Inc.,* 567 F.3d 1191, 1196 (10th Cir. 2009)). , By contrast, Mohawk argues the scope of the arbitration provision extends beyond payment disputes to include " 'any ... claim' relating to products delivered to CAP Carpet or invoices for those products" (Doc. 28 at 13) (ellipsis in original), and is therefore a "broad" arbitration clause (*see also id.* at 14) (arguing that the relevant clause requires arbitration of any "payment dispute [or] claim arising out of or relating to any product delivered to the buyer") (alterations in original). Mohawk substitutes the "or" for "of," arguing the latter term's inclusion is a scrivner's error (Doc. 24–1 at 3 n. 3). Either way, this Court's conclusion regarding the clause's

breadth with respect to CAP Carpet's claim would be the same.

Broken into its component parts, the arbitration clause regulates the Mohawk–CAP Carpet relationship in three ways, requiring arbitration of: (1) "any payment dispute of claim arising out of or relating to any product delivered to the buyer"; (2) "any payment dispute of claim arising out of or relating to ... any invoice related thereto [*i.e.,* a payment dispute related to an invoice associated with a product delivered to the buyer]"; and (3) "any payment dispute of claim arising out of or relating to ... any breach thereof [*i.e.,* a payment dispute related to the breach of an invoice associated with a product delivered to the buyer]." This Court agrees with CAP Carpet that the clause is clearly limited to matters of "payment."

But simply because the arbitration clause does not extend to every conceivable dispute that might relate to the Mohawk–CAP Carpet relationship does not mean that the arbitration clause is narrow with respect to the matters it clearly addresses. In the context of this specific relationship, a "payment dispute" can arise in a variety of ways: CAP Carpet could resist Mohawk's call for reimbursement in the amount of a tax Mohawk claims it owes on a sale (*see* Doc. 24–2 at 7, ¶ 7); or CAP Carpet could claim the Mohawk product was not of merchantable quality (*see id.* at 7, ¶ 1); or CAP Carpet could object to the manner in which Mohawk alters the terms of credit (*see id.* at 7, ¶ 6). These disputes

---

4. *NCR Corp.,* a later case, characterized this portion of *Nestle Waters* in a way that might suggest questions of agreement-claim relation are bound up with the presumption of arbitrability and party intent in such a way that "if an action can be maintained without reference to the contract or relationship at issue, the action is likely outside the scope of the arbitration agreement—along with the presumption in favor of arbitrability and the in-

tent of the parties." 512 F.3d at 814 (quoting *Nestle Waters,* 505 F.3d at 505). *NCR Corp.* therefore omits the concluding words of the sentence in *Nestle Waters* it quotes, words which make clear that agreement-claim relation, along with the presumption in favor of arbitrability and the party's intent, work together to "provide sufficient guidance" on scope questions.

could be brought under a variety of legal theories—breach of contract, misrepresentation, unjust enrichment, the list goes on. And all such disputes, like the claim raised here, are "payment disputes" relating to Mohawk's products, insofar as each contests the amount or nature of a payment. "[T]he exclusion of some areas of possible dispute from the scope of an arbitration clause"—*i.e.*, those matters which are not payment disputes related to Mohawk products, like a hypothetical claim of tortious interference alleging Mohawk purposefully and wrongfully poached CAP Carpet customers, or a business defamation claim— "does not serve to restrict the reach of an otherwise broad clause in the areas in which it *was* intended to operate." *Alticor, Inc. v. Nat'l Un. Fire Ins. Co. of Pittsburgh*, 411 F.3d 669, 673 (6th Cir. 2005) (emphasis added) (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 624 n. 13, 105 S.Ct. 3346). In the context of a "payment dispute," then, the arbitration clause is broad. *See Chelsea Family Pharm. PLLC*, 567 F.3d at 1199 (concluding that an arbitration agreement under which the parties agreed to arbitrate "any controversy or claim arising out of or relating to payments to [plaintiff] by [defendant]" was "broadly inclusive when it comes to payments"). *See also Nestle Waters N. Am., Inc.*, 505 F.3d at 505 (noting the use of "arising out of" in an arbitration clause indicates an "extremely broad" clause). An arbitration clause is not "broad" or "narrow" in the abstract; instead, it obtains breadth when viewed in the context of the parties' relationship and the factual predicates of the relevant claim for relief.

Therefore, this Court must grant the present Motion "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers" CAP Carpet's claim. *Highlands Wellmont Health Net., Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir.2003). CAP Carpet's ar-guments do not meet that high bar, in large part because CAP Carpet bases its scope-of-arbitrability arguments on an artificially-narrowed version of the arbitration clause. For instance, it emphasizes that the 1996 Agreement "is not an agreement for pricing and is not evidence of any purchase transaction between Mohawk and CAP Carpet" and, further, that its Kansas state-law claim "does not arise out of the 1996 [Agreement] and will not require" that Agreement's interpretation (Doc. 26 at 8). These arguments appear to be bottomed on the Sixth Circuit's admonition that "[i]f ... reference [to the agreement containing the arbitration clause] is not necessary to the resolution of a particular claim, then compelled arbitration is inappropriate, unless the intent of the parties indicates otherwise." *NCR Corp.*, 512 F.3d at 814.

But of course, the intent of the parties (at least as evidenced by the clause's text; the record contains no other evidence going to actual party intent) does indicate otherwise in this case. The parties did not agree to an arbitration clause limited to payment disputes "arising out of or relating to" the credit-related provisions of the 1996 Agreement. Instead, the parties agreed to submit to arbitration all payment disputes "arising out of or relating to" Mohawk's products, product invoices, and the breach of subsequent invoices. Therefore, this case is distinguishable from cases examining more common text, which tend to feature parties who agree to arbitrate only disputes arising out of or relating to a specific contract. *See, e.g., id.* at 811–12 (examining an arbitration clause under which the parties agreed to submit to arbitration "[a]ny controversy or claim arising out of or relating to this contract [*i.e.*, a "software licensing agreement"], or breach thereof").

For the same reason, CAP Carpet's argument that its unfair competition claim sounds in tort, and not in contract, is not determinative. Properly understood, the parties did not agree to submit only contract-based payment disputes to arbitration, much less to exclude unfair competition claims from arbitration. *See Moses H. Cone Mem. Hosp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (requiring doubts concerning the scope of arbitrability to be resolved in favor of arbitration).

CAP Carpet also notes its state law claim entitles it not just to the supracompetitive premium it alleges resulted from a conspiracy, also gains the "full consideration" it paid for Mohawk underlay products (Doc. 26 at 9). CAP Carpet appears to misstate Kansas law on this point. In April 2013, the Kansas legislature enacted a statute repealing large portions of the Kansas Restraint of Trade Act, including the "full consideration" damages provision. *See* 2013 KAN. SESS. LAWS ch. 102, 504–08 (noting that the Act repeals KAN. STAT. ANN. § 50–115). In its place, the legislature provided for treble damages recovery, pegged to the party's actual damages. KAN. STAT. ANN. § 50–161. That provision applies retroactively. *Id.* at § 50–164.

However, this substantial change in Kansas law was not briefed. Even if the law is as CAP Carpet claims, this description of the extent of recovery to which CAP Carpet is entitled under Kansas law simply changes the required proof at the damages stage. Instead of proving up the supracompetitive premium it paid, CAP Carpet must show the full price it paid for each item to obtain "full consideration" damages. But still CAP Carpet fails to counter Mohawk's contention that the damages burden "necessitates inquiry into the actual invoice prices CAP Carpet paid for [Mohawk] products." This is so even though Mohawk made that contention in its opening brief (*see* Doc. 24–1 at 8), and

so CAP Carpet had ample opportunity to point to another source of damages proof in its reply, if it could.

In sum, CAP Carpet agreed to submit all "payment disputes of claims" that might arise with Mohawk to binding arbitration, and the record and case law does not provide an escape from arbitration for CAP Carpet's restraint of trade claim. Read in conjunction with the strong federal policy favoring arbitration, that agreement was not limited to payment disputes based on specific legal theories. It was not limited to payment disputes based only on the credit-related document in which the arbitration clause was contained. And the agreement is not now challenged as invalid *ab initio* under Georgia law. CAP Carpet's Mohawk-specific claim is stayed pending the outcome of arbitration.

\* \* \*

**MOTION FOR LEAVE TO AMEND ANSWER TO THE DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**(CASE No. 10–MD–2196, DOC. 828)**

Mohawk has been much more active in litigating defenses to the Direct Purchasers' claims. Those efforts are accurately summarized in the Direct Purchasers' brief, and need not be recited in detail here (Doc. 865 at 3–5) (noting Mohawk actively engaged in deposing class representatives and Direct Action Plaintiffs; engaged in discovery motion practice; moved to dismiss the DPCAC; sought reconsideration of a portion of this Court's Order denying that motion; opposed a motion for default judgment; opposed a motion to suspend litigation with respect to certain Defendants; opposed Direct Purchasers' settlement with certain Defendants; opposed the Direct Purchaser Motion for Class Certification; and, along with Defendant Leggett & Platt, submitted an expert

report in support of that opposition). Unlike CAP Carpet, Direct Purchasers refused to consent to Mohawk's filing an amended answer adding an arbitration-related defense (Doc. 828 at 3 n. 2). Mohawk now seeks leave to amend its Answer to the DPCAC, pursuant to Federal Civil Rule 15.

Rule 15(a)(2) provides that after a responsive pleading is filed, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." A district court should liberally grant leave to amend, but may appropriately deny leave "in instances of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Glazer v. Chase Home Fin., LLC,* 704 F.3d 453, 458 (6th Cir.2013) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

Direct Purchasers argue that leave to amend should be denied for two reasons: (1) amendment would be futile because the amendment sought would only add an arbitration defense that Mohawk has waived; and (2) Direct Purchasers would be prejudiced if leave to amend is granted (Doc. 865 at 5). To the extent Direct Purchasers argue that leave to amend should be denied because Mohawk acted in bad faith in the manner in which it raised the arbitration clauses, such an argument, while superficially attractive, is without evidentiary support. *See* Doc. 865 at 7 (expressing doubt "that Mohawk's omission was simply oversight"); *id.* at 10 (arguing "Mohawk's about-face on arbitration is no more than gamesmanship").

As Direct Purchasers note, these ostensibly separate grounds for denying leave to amend in fact depend on resolution of the same issue: the existence of prejudice to Direct Purchasers as a result of Mohawk's delay in tendering its arbitration-related defense. Amendment would only be futile if, as noted above, Mohawk took actions completely inconsistent with asserting an arbitration defense *and* that conduct caused Direct Purchasers actual prejudice. Rule 15(a)(2) also permits a district court to deny leave to amend if amendment would prejudice the non-moving party. However, Direct Purchasers recognize that in the context of this case, leave to amend on the supposedly standalone basis of prejudice could only be granted "for the same reasons as are [included] in the required waiver analysis" under the FAA (*id.* at 5).

**Actions Completely Inconsistent with any Reliance on an Arbitration Defense**

Direct Purchasers claim that Mohawk's actions in this MDL, spanning almost three years as of the time the present Motion was filed, constitute "actions that are completely inconsistent with any reliance on an arbitration agreement." *Johnson Assocs. Corp.,* 680 F.3d at 717. Mohawk's argument in opposition is intricate. First, it notes the proposed Answer amendment asserts an arbitration defense only as to absent members of the putative class. *See* Doc. 828 at 1 ("[Direct Purchasers'] claims on behalf of putative class members are barred due to the presence of mandatory, binding arbitration agreements between Mohawk [and] certain putative class members."). Second, it asserts that "the law is clear" that before a class is certified and the post-certification opt-out period runs, class members are not "parties" to a litigation, at least for arbitration purposes (Doc. 872 at 3). Third, and because absent members of the putative class are not "parties" to the litigation, under arbitration waiver analysis, Mohawk's litigation activities "count" only in determining whether an arbitration defense entered

into with a *putative class representative* has been waived (*id.* at 4). Fourth, Mohawk argues that because it cannot move to compel arbitration of a class member's claims until that class member becomes a "party" to the litigation, it could not yet have waived that arbitration defense. Direct Purchasers reject this line of argument, contending "the affirmative defense of arbitration is now asserted against the class representatives only" because the status of absent members of a class, putative or certified, is *"sui genersis"* (Doc. 865 at 12).

Contrary to Mohawk's contentions, the case law on this point it far from "clear." As Direct Purchasers note, much of the case law Mohawk cites works from the undeveloped assumption that prior to certification absent members of a putative class are not parties *for purposes of arbitration waiver analysis. See In re TFT-LCD (Flat Panel) Antitrust Litig.,* 2011 WL 1753784, at *4 (N.D.Cal.2011).

Moreover, Mohawk's theory carries troubling implications for fairness and judicial efficiency. Consider a case in which a putative class, led by a single putative class representative, seek some form of monetary relief from one defendant. That defendant could then vigorously litigate the case for an extended period of time but, under Mohawk's view, would preserve its arbitration defense as against all absent members of the putative class, so long as the defendant moves to compel arbitration by Mohawk's purported "deadline" for doing so. (*See* Tr. for Hearing on Class Certification and Arbitration Matters (hereafter "Hearing Tr.") at 242) ("[The Court:] Are you saying there is a never a deadline beyond which . . . it's okay to say, . . . I've got this [arbitration defense] I want to now raise now that I know that there's been a class? [Counsel for Mohawk]: There is a deadline related to filing a motion to compel against unnamed class members, [namely,] after the class certification decision."). Under Mohawk's logic, the motion must then be granted, for an arbitration defense asserted against absent class members cannot be waived prior to class certification, no matter the amount or type of pre-class certification litigation activity. As a result, after several years of litigation, the court would have pending before it the claims of only the class representative, who would helm a now-empty class previously populated by the absent class members who have been shuttled to arbitration.

However, this Court need not definitively delve into this unsettled area of law, because, as noted above, this Circuit's waiver standard is conjunctive—it requires a showing of litigation activity inconsistent with an intent to rely on an arbitration defense *and* a finding that the party opposing invocation of the arbitration clause has suffered actual prejudice from that delay. *See Johnson Assocs. Corp.,* 680 F.3d at 717. Therefore, even if this Court assumes Mohawk's extensive litigation activity in this case *is* activity completely inconsistent with Mohawk's intent to rely on its arbitration agreements with absent members of the putative class, this Court still must find that Direct Purchasers have suffered actual prejudice; arising from Mohawk's delay, before it may find Mohawk has waived these arbitration defenses, and therefore that the proposed Answer amendment would be futile.

### Actual Prejudice to Direct Purchasers

Direct Purchasers identify actual prejudice, owing to Mohawk's delay, in four forms. First, Direct Purchasers note that "Mohawk's three-year delay is substantial" (Doc. 865 at 8). Second, Direct Purchasers argue that granting the present Motion would mean Direct Purchasers would have "been forced to incur unnecessary delay or expense" because "[m]uch of [Direct Pur-

chasers] and this Court['s efforts] in response [to Mohawk's motion practice and discovery activity] would be wasted" (*id.* at 8–9). Third, Direct Purchasers note that this past prejudice "would extend through the duration of this litigation" as Direct Purchasers would be forced "to scramble to prepare [for arbitration] by collecting new evidence and formulating new strategies" in response to the lately-raised arbitration defenses (*id.* at 10). Fourth, Direct Purchasers assert Mohawk has "gain[ed] something in class discovery that would be unavailable in arbitration," namely, depositions (*id.* at 10).

After careful review of the parties' briefing, oral argument, and the relevant case law, this Court concludes that these asserted bases of prejudice are not enough to demonstrate Mohawk has waived the arbitration defenses. That conclusion is guided by two related principles. First, "any doubts concerning the scope of arbitrable issues [must be] resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25, 103 S.Ct. 927. Second, "[t]he strong presumption in favor of arbitration works against finding waiver in cases *other than those with the most compelling fact patterns.*" *JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388, 393 (6th Cir.2008) (emphasis added).

As previously noted, delay alone is not sufficient to establish the prejudice necessary to find waiver—Direct Purchasers' claim to the contrary, that "Mohawk's three-year lapse is at the upper bounds of when courts even *consider* waiver" (Doc. 865 at 8) (emphasis added), appears unsupported in the case law. Moreover, as Mohawk accurately notes, Direct Purchasers' third basis for finding prejudice, that absent class members would be prejudiced in

having to prepare for submission of their claims to arbitration, is tantamount to a claim that having to submit to arbitration is itself a form of prejudice (*see* Doc. 865 at 11) ("Lastly, arbitration would prejudice class members since they would now need to arbitrate claims rather than proceed by a class action."). The case law rejects such a view. *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 230 (2d Cir.2001).

Direct Purchasers' remaining bases of prejudice—that it has incurred unnecessary litigation and discovery expenses, and that Mohawk has gained a strategic advantage from delaying assertion of the defense—present closer calls, but are not sufficient to overcome the FAA's presumption in favor of arbitration. This Court notes neither basis of prejudice is specifically described by affidavit or declaration.

First, Mohawk argues that Direct Purchasers failed to identify "a single litigation event that would not have occurred if Mohawk sought to compel arbitration earlier" because all of the other non-settling Defendants, along with Mohawk, would have still been parties to the case in that alternative world (Doc. 872 at 9). Direct Purchasers anticipated this argument by arguing "Defendants are not all the same," noting Mohawk's focus on underlay, and claiming that certain expenses were incurred with respect to Mohawk that "are unique to Mohawk" (Doc. 865 at 11).

Critically though, the supposedly unique litigation events Direct Purchasers cite are either general in nature so that this Court cannot meaningfully evaluate whether Direct Purchasers suffered actual prejudice as a result of the delay (*e.g.*, "reviewing Mohawk's thousands of documents"), or are demonstrably not unique to Mohawk (*e.g.*, "responding to Mohawk's expert report" in opposition to class certification, submitted in concert with Defendant Leg-

gett & Platt, who likewise heavily focused on the production of underlay). Moreover, there is reason to doubt that Direct Purchasers would have opted to litigate their claims with respect to Mohawk differently—or differently enough to justify waiver—had they received more timely notice of the arbitration defense. Even assuming arbitration clauses exist for all absent purchasers of Mohawk products, Direct Purchasers still gain much by asserting claims against Mohawk arising out of only the purchases of the named class representatives—they gain the possibility of judgment being entered against another member of the alleged conspiracy; who is jointly and severally liable for the antitrust harm of the entire conspiracy; and whose corporate treasury would be available to satisfy some of the enormous potential conspiracy-wide liability presented by this case.

In a similar vein, this case differs in an important respect, bearing on actual prejudice, from the principle cases on which Direct Purchasers rely. Take *Edwards v. First Am. Corp.*, 289 F.R.D. 296 (C.D.Cal. 2012). There, the district court concluded a title insurance company had waived arbitration defenses it had with every member of a certified class—"the [title agency] used standard form title insurance policies in Ohio [(the only state from which the class drew its members)] that included arbitration provisions since 1987." *Id.* at 306. Like Mohawk, the title insurance company moved for leave to amend its answer, albeit after seemingly more substantial litigation activity. The court noted that "[f]orcing the class to arbitrate now would result in [the] costs [associated with that litigation activity] being stranded." *Id.* at 308. That observation is incontestable—all members of the class, who had asserted claims against two defendants from the same corporate family, would be shut out of federal court if leave to amend were granted and the class claims submit-

ted to arbitration. Class counsel would be left with nothing to show for litigating two class certification motions and two appeals, and successfully opposing a petition for *certiorari*, among other class action-litigation expenses.

The same cannot be said of this case, where some portion of Mohawk's customers may not be subject to arbitration agreements; other Defendants' customers assuredly are not; Defendants' litigation positions have, with a few exceptions, been formed jointly; and joint and several liability otherwise binds Defendants together. In short, granting leave to amend would not, as in this Court's prior hypothetical or in *Edwards*, empty the proposed Direct Purchaser class.

Second, Mohawk's "strategic advantages" from its litigation posture are not sufficiently clear to justify overcoming the presumption in favor of arbitration. In their Opposition brief, Direct Purchasers categorically state that depositions "would be unavailable in arbitration" (Doc. 865 at 10). However, at oral argument, counsel for Direct Purchasers called on his own experience with arbitration to show that the matter is not so clear, noting: "I have been in arbitration proceedings where there are parallel arbitration and litigation proceedings, where there is discovery available in one but not in the other, and made the argument for admissibility [of discovery obtained in the parallel ligation] and been successful, been partially successful, and been unsuccessful. Arbitrators take different approaches" (Hearing Tr. at 230).

Of course, in relating this exchange, this Court does not suggest that counsel must predict what would occur in future arbitration proceedings under a waiver analysis. However, at the least, this exchange demonstrates there is significant doubt as to how arbitration would deal with specific

discovery materials produced in this case. Moreover, that doubt cuts both ways, in that an arbitrator may deem discovery obtained by Mohawk in this matter to be inadmissible in the later arbitration proceedings.

Given these doubts, and this Court's inability to discern specific additional instances of prejudice to Direct Purchasers attributable to Mohawk's delay in raising the arbitration defense, this Court concludes Mohawk has not waived its arbitration defenses with respect to the absent members of the putative Direct Purchaser class. Therefore, the proposed DPCAC Answer amendment is not futile, and leave to amend is, reluctantly, granted.

\*　　\*　　\*

### CONCLUSION

These Motions are tardy, no doubt. Neither Motion should have been filed; the arbitration defenses should have been raised earlier in this litigation—and with respect to Direct Purchasers, *much* earlier. Unfortunately, as the posture of these Motions seems to demonstrate, Mohawk failed, inadvertently or otherwise, to understand the nature of its own agreements with customers.

At least one positive note emerges from this morass. Mohawk's Motions have, for a time, centered Defendants' attention on the issue of arbitration agreements. Six briefs, appendix materials, a declaration, a supplemental brief, a related Motion to Strike, and an opposition to that Motion to Strike have all been filed in a manner visible to all Defendants through this Court's electronic docket. So have this Court's pre-hearing questions dealing with arbitration matters. And a significant portion of a day-long hearing, well attended by defense counsel, discussed the issue of lately-raised arbitration clauses.

No Defendant, or counsel for Defendant, can now claim "inadvertent error" if, later in this litigation, they "discover" and seek to invoke arbitration agreements not previously noticed-and by noticed, this Court means *specifically* noticed. No party should again suggest that a footnote contained in a prior Motion, referring generally to "Defendants['] inten[t] to enforce" arbitration agreements, provides sufficient notice as to arbitration agreements that have not previously been brought to the attention of the party to whom the agreements apply (*see* Doc. 828–1 at 2–3). Diligent parties and counsel would have, and should have, checked company files and pleadings to avoid Mohawk's mistakes. As this Opinion demonstrates, waiver doctrine is tilted decidedly in favor of preserving and enforcing arbitration clauses. But future motions to assert previously unmentioned arbitration agreements likely would present a different case, and a different outcome.

For the reasons discussed above, Mohawk's Motion to Compel Arbitration and Stay Claims of Direct Action (Non–Class) Plaintiff CAP Carpet, Inc. as they relate to Mohawk (Case No. 13–pf–10004, Doc. 24) is granted. Mohawk's Motion for Leave to Amend its Answer to the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (Case No. 10–md–2196, Doc. 828) is also granted.

IT IS SO ORDERED.