RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0310p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JPD, INC., d/b/a NORTHLAND MEDICAL PHARMACY;
JAMES P. DICELLO, Individually and on behalf of his
minor child Nicholas DiCello; ALICIA DICELLO;
GINA DICELLO,

    *Plaintiffs-Appellees,*

   *v.*

CHRONIMED HOLDINGS, INC.,

    *Defendant-Appellant.*

No. 07-4427

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 07-00646—Gregory L. Frost, District Judge.

Argued: April 24, 2008

Decided and Filed: August 22, 2008

Before: SUHRHEINRICH, CLAY, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Richard A. Cirillo, KING & SPALDING, New York, New York, for Appellant. James D. Curphey, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellees. **ON BRIEF:** Richard A. Cirillo, KING & SPALDING, New York, New York, Alexander M. Andrews, Rebecca B. Jacobs, ULMER & BERNE, Columbus, Ohio, for Appellant. James D. Curphey, Kyle T. Shaw, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellees.

---

## OPINION

---

  COOK, Circuit Judge. In late 2005, Defendant Chronimed Holdings bought Northland Pharmacy from Plaintiff James P. DiCello. Chronimed paid DiCello twelve million dollars up front and promised additional cash if Northland's earnings over the next year hit a benchmark. The parties agreed to arbitrate any dispute over the "calculation" of Northland's earnings and "all issues having a bearing on such dispute."

  When Chronimed later informed DiCello that it would not pay the added cash because Northland's earnings failed to reach the benchmark, DiCello sued, claiming that Chronimed owed

the additional payment because the earnings target would have been met had Chronimed operated the business as the contract promised. Chronimed promptly moved the district court to compel arbitration, but the district court held that Chronimed waived that contractual right through its pre-litigation conduct. Because we disagree, and because we find that DiCello's claims fall within the scope of the contract's arbitration clause, we vacate and remand with instructions to compel arbitration.

I

In the early 1980s, DiCello, through his company, JPD Inc., opened Northland Medical Pharmacy in Columbus, Ohio. As a "specialty pharmacy," Northland differed from the average drugstore in that it specialized in selling drugs and injectable therapies needed to treat chronic, complex diseases such as cancer and multiple sclerosis. After twenty years of growth, Northland's sales in 2004 exceeded twenty million dollars.

Around that time, Northland caught the eye of Chronimed Holdings, which operates a national network of specialty pharmacies. Seeking to augment its network, Chronimed entered into talks with DiCello to purchase Northland.

In October 2005, the parties struck a deal. Principally in exchange for twelve million dollars, Chronimed acquired full ownership of Northland. But Chronimed did not want DiCello to merely turn over the keys and leave, taking with him his valuable operations expertise. Instead, it negotiated an employment agreement that kept DiCello at Northland for two years after the sale. DiCello agreed to help run Northland until the end of 2006 and planned to transition to an informal business-development role afterwards.

To align their interests during DiCello's holdover tenure, and as part of arriving at a fair purchase price, Chronimed agreed to pay DiCello an "additional purchase price payment" based on Northland's 2006 earnings. Specifically, Chronimed promised DiCello that if Northland's EBITDA—earnings before interest, taxes, depreciation, and amortization—exceeded $2.7 million, DiCello would receive the excess. To ensure DiCello a fair shot at earning the additional payment, Chronimed also committed to maintaining Northland's prior business and employment practices, as well as expanding investment in some areas.

The mechanics of the contract worked as follows: Chronimed promised to promptly calculate Northland's earnings at the end of 2006. It was to then send DiCello its EBITDA calculation for the year, accompanied by financial statements, supporting documents, and an audit certificate. If DiCello disagreed with Chronimed's calculation, he had the right to lodge an objection within fifteen days, setting forth "in reasonable detail" the basis for his disagreement. At that point, the parties would undertake a good-faith effort to resolve the dispute. If DiCello continued to "disagree with [Chronimed's] calculation of [Northland's] EBITDA," the parties agreed to refer the dispute, and all related issues, to an "accounting referee"—the accounting firm KPMG.

Relations between the parties soured soon after the sale. DiCello chafed at Chronimed's operating decisions that he felt hurt Northland's performance (and his ability to earn the additional payment). For example, DiCello believed that Chronimed's reduction of Northland's sales and marketing budget, in violation of its promise to increase it, crippled his push to boost HIV- and transplant-drug profits.

At year's end, Chronimed notified DiCello that Northland—with $1.6 million in EBITDA, by its calculation—fell short of the earnings target. Using the arbitration procedure set forth in § 2.3(b) of the Purchase Agreement, DiCello objected to Chronimed's calculation, complaining that Chronimed depressed Northland's earnings by shortchanging some aspects of the operations and poor decision-making.

Chronimed's response letter to DiCello of July 6, 2007, disputed his allegations and took the position that his objection failed to contest the company's EBITDA calculation in sufficient detail. *See* Purchase Agreement § 2.3(b) (requiring DiCello's objection to "be set forth in reasonable detail"). Nonetheless, the company invited DiCello to meet to "discuss this matter with a view toward an amicable resolution."

A few days later, DiCello sued Chronimed, demanding an accounting plus damages, claiming breach of contract, promissory estoppel, and unjust enrichment. Chronimed moved the district court to stay the suit and compel arbitration. The district court denied that request, finding that Chronimed waived its right to invoke arbitration by its July 6 response letter to DiCello. With a stay from the district court, Chronimed now appeals the denial of its motion. *See* 9 U.S.C. § 16 (authorizing immediate appeals from denials of motions to compel arbitration).

## II

### A

Although the district court's decision grounded on waiver assumed that this dispute is arbitrable, our de novo review requires that we first confirm arbitrability, determining whether "a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (citing *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).

The Purchase Agreement at § 2.3(b) reads:

> If Sellers [DiCello and family's] Representative disagrees with Buyer [Chronimed's] calculation of the Company [Northland's] EBITDA, Sellers' Representative shall advise the Buyer in writing . . . . In the event Buyer and Sellers' Representative are unable to resolve such dispute within 15 Business Days after delivery of the Objection Notice . . . such dispute shall be submitted to, and all issues having a bearing on such dispute shall be resolved by the Accounting Referee. . . . The Accounting Referee's resolution of such dispute shall be final, conclusive and binding on the parties.

Because the parties agree this is a valid arbitration agreement, we need answer only one arbitrability question: do DiCello's claims against Chronimed fall within the agreement's scope?

Seeking to avoid arbitration, DiCello urges us to answer no. As he sees it, § 2.3(b) covers only disputes over Chronimed's actual calculation of Northland's earnings, not complaints regarding failed contractual commitments to maximize earnings, including Chronimed's failing "to [reasonably] maintain the staffing of the company" and to "hire an additional salesperson to support the growth of Northland Pharmacy." Purchase Agreement §§ 6.7, Annex IV. Because his claims do not center on Chronimed's math, DiCello argues that arbitration is inappropriate.

We would find DiCello's argument convincing, except that § 2.3(b) covers not only disputes over Chronimed's EBITDA calculation, but also "all issues having a bearing on such dispute." Given the structure of the parties' agreement, that extra language is pivotal. All of DiCello's claims seek but one thing: the additional purchase price payment. The right to receive that additional payment hinged solely on Chronimed's bottom line—the EBITDA calculation. To the extent that Chronimed's business practices depressed Northland's EBITDA, as DiCello alleges, those practices "ha[d] a bearing on" Chronimed's EBITDA calculation. Fairly read, the arbitration provision encompasses DiCello's business-practice complaints, as well as those focused on pure accounting issues. While we agree that this interpretation is not the only plausible one, the law requires us to resolve ambiguity "concerning the scope of arbitrable issues . . . in favor of arbitration." *NCR Corp.*

*v. Korala Assocs.*, 512 F.3d 807, 813 (6th Cir. 2008) (internal citation and quotation marks omitted). Because we cannot say with "assurance" that the arbitration clause here does not cover the claims DiCello's complaint raises, we must agree with Chronimed that this dispute is arbitrable. *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004).

B

Having decided that DiCello's claims fall within the scope of the parties' agreement to arbitrate, we turn to his alternative argument to avoid the arbitration clause: Chronimed waived its right to invoke arbitration. We read DiCello's waiver posture as having two distinct prongs: 1) Chronimed failed to satisfy a contractual precondition to arbitration and 2) Chronimed's conduct frustrated DiCello's pre-litigation efforts to arbitrate their dispute.

*Failure to Satisfy Contractual Precondition to Arbitration*. DiCello first contends that Chronimed waived its right to arbitrate by failing to satisfy its obligation to thoroughly document its EBITDA calculation through accurate and timely records, interim calculations, and audit certifications. DiCello alleges that Chronimed either failed to supply the relevant documents or produced deficient ones. This failed precondition, he reasons, now bars Chronimed from invoking arbitration.

Chronimed, on the other hand, insists that whether it satisfied the contract's documentation requirements is not for us to say; it is the arbitrator's call. To evaluate this argument, we look to the Supreme Court's decision in *Howsam v. Dean Witter Reynolds*, *Inc.*, 537 U.S. 79 (2002), which delineated the division of labor between judges and arbitrators. There, the Court resolved a disagreement among the circuits over who should decide whether to apply a National Association of Securities Dealers ("NASD") rule imposing a time limit for bringing disputes. *Id.* at 82–83.

The Court began by examining the role of judges, finding that they decide "questions of arbitrability" that "contracting parties would likely have expected a court to have decided," so as to "avoid[] the risk of forcing the parties to arbitrate a matter that they may well not have agreed to arbitrate." *Id.* at 83–84. The Court noted that disputes about "whether the parties are bound by a given arbitration clause," and disagreements over "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" are two types of "question[s] of arbitrability" that a court decides. *Id.* at 84.

Questions over arbitration procedures stipulated to in the contract, on the other hand, "which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." *Id.* (citation and emphasis omitted). This category, which includes questions regarding "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitration have been met," as well as "allegations of waiver, delay, or a like defense to arbitrability," are questions that parties would "likely expect" to be entrusted to an arbitrator for resolution. *Id.* at 84–85 (internal citations and quotation marks omitted); *see also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964) (holding arbitrator should decide whether the party seeking arbitration had properly completed a grievance procedure that served as a prerequisite to arbitration under the parties' agreement).

Applying this framework, the Court concluded that an NASD arbitrator should decide the applicability of the NASD time-limit rule for two principal reasons. First, the underlying dispute centered on differing interpretations of the contract's "grievance procedures," presumptively making it for the arbitrator to decide. *Howsam*, 537 U.S. at 85. Second, the Court stressed the NASD arbitrator's expertise regarding NASD rules. "It is reasonable to infer," Justice Breyer wrote, "that the parties intended the agreement to reflect that understanding," particularly because "align[ing] (1) decisionmaker with (2) comparative expertise will help better to secure a fair and

expeditious resolution of the underlying controversy—a goal of arbitration systems and judicial systems alike." *Id.*

Our review of *Howsam* convinces us that Chronimed's contractual obligation to document Northland's finances is exactly the type of "condition[] precedent to an obligation to arbitrate" that *Howsam* presumptively allocated to the arbitrator. *Id.* It is a "procedural question[] . . . grow[ing] out of the dispute [that] bear[s] on its final disposition," *id.* at 84, and KPMG undoubtedly possesses greater expertise in determining how much disclosure an EBITDA audit requires. Accordingly, because that is what the parties would most likely have expected when they contracted, it is KPMG's role to decide whether Chronimed satisfied its disclosure obligation.

*Pre-litigation Conduct.* With his second waiver argument, DiCello contends that Chronimed forfeited any arbitration right because it previously acted in a manner "directly at odds" with its current desire to arbitrate. Courts examine whether a litigant has acted in a manner "completely inconsistent with any reliance [on an arbitration agreement]." *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 573 (6th Cir. 2003); *see also Khan v. Parsons Global Servs.*, 521 F.3d 421, 428 (D.C. Cir. 2008) (filing a motion for summary judgment waives the right to invoke arbitration). Though we have declined to sharply define what conduct suffices, it typically involves a defendant's failure to timely invoke arbitration after being sued or its interference with a plaintiff's pre-litigation efforts to arbitrate. *Highlands*, 350 F.3d at 574. The strong presumption in favor of arbitration works against finding waiver in cases other than those with the most compelling fact patterns. *Highlands*, 350 at 573.

Here, DiCello alleges that Chronimed's July 6, 2004, letter, in which it responded to DiCello's objection to the company's EBITDA calculation, frustrated his efforts to arbitrate the dispute. In particular, having taken the first step down the path to arbitration by filing an objection, DiCello claims that Chronimed derailed the process with its stance that his objection was not "sufficient for purposes of initiating the procedures specified in § 2.3(b)." Though Chronimed's response letter welcomed further discussion, DiCello viewed Chronimed's letter as declaring its unwillingness to engage in the arbitration process called for in the contract. Chronimed's decision to take that position, DiCello maintains, should now bar the company from invoking arbitration.

While disputing DiCello's characterization of its actions on the merits, Chronimed urges us to defer resolution of this waiver issue to KPMG also, pointing again to *Howsam*. But we join the First and Third Circuits in holding that the court, not the arbitrator, presumptively evaluates whether a defendant should be barred from seeking a referral to arbitration because it has acted inconsistently with reliance on an arbitration agreement. *See Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 217–18 (3d Cir. 2007); *Marie v. Allied Home Mortgage*, 402 F.3d 1, 13–14 (1st Cir. 2005).[1] True, when read in isolation, the Supreme Court's statement in *Howsam* that "the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability" supports referring such waiver issues to an arbitrator. 537 U.S. at 84 (internal alteration and quotation marks omitted). But "[p]roperly considered within the context of the entire opinion, . . . we believe it becomes clear that the Court was referring only to waiver, delay, or like defenses arising from non-compliance with *contractual* conditions precedent to arbitration, such as the NASD time limit rule at issue in that case . . . ." *Ehleiter*, 482 F.3d at 218–19 (emphasis added); *see also* 9 U.S.C. § 3 (mandating that a court stay an action to permit arbitration only if "the applicant for the stay is not in default in proceeding with such arbitration").

_____

[1]The inconsistent conduct at issue in these cases concerned conduct during a pre-litigation EEOC proceeding, *Marie*, 402 F.3d 1, and litigation conduct, *Ehleiter*, 482 F.3d 207. As we discuss, the reasoning behind these decisions applies equally to the facts here.

Unlike contractually-based waiver, courts have long decided whether conduct inconsistent with reliance on an arbitration agreement waives a defendant's ability to seek an arbitration referral for at least two good reasons. *Marie*, 402 F.3d at 12–13. First, contracting parties likely would not expect arbitrators to resolve these issues because they rarely touch on a dispute's merits. *Id*. at 13. Comparing the expertise of arbitrators and judges only confirms this expectation. Waiver-through-conduct issues ordinarily turn on whether a plaintiff abused the litigation or pre-litigation process, and a court is most adept at policing procedure-abusing conduct. *Id*. Second, referring waiver-through-inconsistent-conduct claims to an arbitrator would often prove "exceptionally inefficient" because just deciding that a party waived arbitration fails to advance the substance of the case—it just gets referred back to the court. *Id*. "This is different in kind from the arbitrator's normal resolution of a gateway issue: normally, the resolution of such an issue would bar not only arbitration but any sort of litigation on the issues by either side." *Id.* at 14. Judicially resolving these claims thus "will help better to secure a fair and expeditious resolution of the underlying controversy." *Howsam*, 537 U.S. at 85. For these reasons, we conclude that *Howsam* did not disturb the traditional rule that the courts presumptively resolve waiver-through-inconsistent-conduct claims.

Turning then to whether the July 6th letter amounted to a waiver of arbitration rights, we hold that Chronimed's actions were not "completely inconsistent" with its later reliance on the arbitration agreement. *Highlands*, 350 F.3d at 573. Although DiCello reads the letter as Chronimed shrugging off the arbitration process, it can also be read as simply signaling to DiCello that Chronimed would challenge the sufficiency of his EBITDA objection if he chose to proceed with arbitration. In other words, by identifying a perceived weakness in DiCello's case, Chronimed "stare[d] down" DiCello, in the hope that he would "simply give up"—conduct we have characterized as "typical posturing." *Id*. at 574. The ambiguity of the letter's message, particularly given DiCello's failure to seek a clarification from Chronimed before filing suit, prevents its meeting the "completely inconsistent" test for conduct that waives the right to invoke the contract's arbitration provision. *Id*. We find no waiver.

C

Finally, DiCello perfunctorily advances two other grounds to avoid arbitration—fraudulent inducement and frustration of purpose. Having examined these arguments, we find the allegations in DiCello's complaint fail to support the invocation of either doctrine under Ohio law.

III

For these reasons, we vacate the district court's order and remand with instructions to grant Chronimed's motion to stay the proceedings and compel arbitration.