CLAY, Circuit Judge,
dissenting.
I respectfully dissent. I cannot conclude that the parties to the Shy Agreement in § 8.4 of the Profit Sharing Plan (“PSP”) agreed to submit a dispute of these dimensions to arbitration. Even if the dispute were arbitrable, I would find that Navistar waived its right to require arbitration by engaging in an unmistakable campaign of avoidance and delay both before and after the SBC intervened to enforce the settlement agreement in the instant litigation. Rather than zealously guarding its right to require arbitration of the instant dispute, Navistar sat quietly on that right until receiving an adverse ruling from the district court. Those are precisely the circumstances in which this Court has found waiver in the past, and the majority errs in straying from that precedent today.
I.
A more direct statement of the factual background to this case is perhaps necessary. As this Court recently summarized, the underlying litigation was filed as a class action in 1992 “when Navistar attempted to reduce its costs for retired employee health and life insurance benefits.” Shy v. Navistar Int’l Corp., 701 F.3d 523, 526 (6th Cir.2012). Navistar claimed it would become insolvent if it were required to comply with its obligation to retirees. Id. Under the threat of facing even deeper cuts to retirees’ benefits if the company entered bankruptcy, the retirees’ representatives negotiated a settlement to restructure the level and funding of those benefits. Shy v. Navistar Int’l. Corp., No. C-3-92-222, 1993 WL 1318607 (S.D.Ohio May 27, 1993). The district court, though expressing concern that “the settlement agreement will impose hardship on many retirees,” in due course accepted the agreement of the parties (“the Shy Agreement”) and entered it as a consent decree. Id. at *1, *12-13.
The Supplemental Plan, which is at the heart of the dispute before this Court today, formed a central component of the Shy Agreement. The Shy Agreement replaced retirees’ prior benefits package with two plans: the “Base Plan” and the “Supplemental Plan.” Id. at *4. The Base Plan dramatically cut retirees’ basic life and health insurance benefits and reduced *832 Navistar’s funding obligation to well below half its pre-settlement value. Id. In accepting the Shy Agreement, the district court noted that the painful cuts to retirees would be offset by the Supplemental Plan, explaining:
[T]he Supplemental Plan, which is a truly innovative concept, turns over much of the ownership of Navistar to the very retirees who must sacrifice benefits under the settlement agreement, a Plan which could well alleviate some (perhaps as much as one-half or more) of the hardship which the settlement will require retirees to endure. The Supplemental Plan is a trust which will be administered by retirees and their representatives. Navistar must contribute 50% of the shares of its common stock and a portion of its future profits to the trust established under the Supplemental Plan. The income generated by the Supplemental Plan can be used, for instance, to reduce the premiums which retirees must pay for their health insurance. Thus, if the retirees’ sacrifices allow Navistar to return to prosperity, the retirees will own a significant share of the consequent gain in the value of the company.
Id. The SBC was formed to administer the Supplemental Plan. The terms governing the profit sharing element of the Shy Agreement are contained in a document referred to by the parties as the Profit Sharing Plan, or “PSP.” Navistar’s obligation to pay a portion of its profits to fund the Supplemental Plan, however, is a constituent part of the larger settlement agreement and consent decree.
The PSP sets the amount of Navistar’s profit to be contributed to the Supplemental Plan as a function of the performance of certain “covered operations” and the number of qualifying hours worked by employees in those covered operations. Covered operations, in turn, are defined in the PSP quite broadly to include Navistar International Transportation Corporation, its parent company Navistar International Corporation, and “their successors and all of their affiliates and subsidiaries, with the exception of Navistar International Corporation Canada.” (R. 399-5, PSP, PGID 1668.) The PSP also includes provisions for the treatment of any entities acquired after the effective date of the agreement, with profit-sharing obligations for those entities varying based on the percent ownership by Navistar and whether the acquisitions are located in the United States.
Each year from 1994 to 2000, Navistar made contributions of varying — but generally substantial — size pursuant to the PSP, ranging in amount from $100,000 in 1995 to $71.6 million in 1999. In 2000, however, the annual contribution dropped to zero and remained there, with the sole exception of a $1.4 million contribution paid in 2004. The company now claims that the $1.4 million contribution was paid in error. As alleged in SBC’s amended complaint, Navistar has claimed not to owe any profit sharing contribution under the PSP even in years where the company as a whole reported a net income of hundreds of millions or even billions of dollars. This outcome stands in marked contrast to the terms of the Shy Agreement that call for Navistar to contribute a portion of its profits to the Supplemental Plan, and to the PSP provisions that so broadly define the covered operations. While Navistar’s contributions under the Profit Sharing Plan have dwindled to zero, the corporate structure has shown a marked increase in the number of business entities owned or controlled by Navistar and its affiliates, a development that the SBC believes reflects a concerted effort to shield the company’s profits from its obligation to the Supplemental Plan.
*833 In the years prior to intervening in the litigation, the SBC encountered significant difficulty obtaining information from Nav-istar that the company was obligated to disclose under the PSP. The company excused its failure to provide timely profit sharing calculations and disclosures based on a restatement of its financial results following irregular audit results and an investigation by the SEC. Beginning in 2009, the SBC sent a number of letters to Navistar requesting additional information and attempting to initiate a dispute resolution process under § 8.4 of the PSP regarding the company’s calculation of the amount it owed to the Supplemental Plan. By 2011, the SBC’s information requests focused on Navistar’s corporate structure and its allocation of costs and revenues among subsidiaries and allied entities for purposes of the PSP. These efforts were unsuccessful, as described in the majority opinion, prompting the SBC to move to intervene in the litigation in order to enforce the terms of the Shy Agreement.
Since its initial intervention in the litigation, the SBC has consistently raised the overarching claim “that Navistar has allocated revenues, costs and profits within the consolidated group for the explicit purposes of robbing the Supplement Program of the profit-sharing payments to which it is entitled.” (R. 395-1, Motion to Enforce, PGID 117.)
II.
I cannot agree with the majority that the present dispute falls within the scope of the federal presumption in favor of arbitration, but that presumption cannot be used as a means of rewriting the clause to encompass a dispute, like the present one, that goes beyond simply contesting the content of Navistar’s disclosures. “The duty to arbitrate a dispute derives from the parties’ agreement and a party cannot be required to submit to arbitration any dispute that the party has not agreed to so submit.” Bratt Enterprises, Inc. v. Noble Int’l Ltd., 338 F.3d 609, 612 (6th Cir.2003); see also Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 302, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010) (“[W]e have never held that [the federal policy favoring arbitration] overrides the principle that a court may submit to arbitration ‘only those disputes ... that the parties have agreed to submit.’ ”) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)).
The arbitration clause at issue in this case covers disputes about “the information or calculations” provided to the SBC by Navistar pursuant to three enumerated sections of the PSP. Thus, the clause has a narrow scope which is defined in reference to the reporting requirements. Moreover, the recourse provided by § 8.4 must be understood in context of the larger Shy Agreement and consent decree, which included in § 15.4 a provision in which the district court retained jurisdiction to “resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation” of the parties’ agreement. (R. 399-2, Shy Agreement § 15.4, PGID 1455.)
The SBC’s allegations, as articulated in the initial motion to enforce and as detailed to a greater degree in the First Amended Complaint, state a claim that Navistar’s manipulation of its corporate and earnings structure constitutes an intentional, material breach of the company’s obligation under the Shy Agreement to annually contribute a share of its profits to the Supplemental Plan. Under our precedent, a consent decree is “strictly construed to preserve the bargained for position of the parties.” Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.1983); see also 23 Williston on Contracts § 63.3 *834 (4th ed.). (a material breach exists where “the breach substantially defeats the contract’s purpose”). Here, it is undeniable that Navistar’s ongoing commitment to pay a portion of its profits to the Supplemental Plan was integral to the “bargained for position of the parties,” id., representing a means of mitigating retirees’ losses if their “sacrifices allow[ed] Navistar to return to prosperity,” Shy, 1993 WL 1318607 at *4. The SBC’s claim for enforcement of Navistar’s obligation to comply with its profit sharing agreement falls naturally within the scope of § 15.4 of the Shy. Agreement as a dispute “relating to ... the enforcement” of the parties’ agreement. (R. 399-2 at PGID 1455.)
The majority acknowledges, as it must, that the SBC’s allegations go beyond reporting requirements to Navistar’s substantive operational conduct insofar as the SBC asserts that Navistar created sham entities, manipulated legal ownership of the newly formed entities with the intent of shielding them from profit-sharing, and reallocated revenue streams away from existing operations to those entities. Maj. Op. at 825-27. Yet the majority determines this dimension insignificant because the operational questions “are still so closely connected to the information Navis-tar provides to the SBC that they still count as disputes over that information.” Id. at 826. This theory admits no limiting principle. If applied as a general rule, any form of misconduct or bad faith dealing, or any fundamental change in the nature of the relevant business or transaction, could be characterized as an informational dispute merely because one party owes reporting duties to the other party. If the parties to the Shy litigation meant to submit all their disputes about Navis-tar’s compliance with the profit sharing obligation to arbitration, they undoubtedly would have stated so directly.
Simply stated, the gravamen of the SBC’s allegations is that Navistar is engaging in a bad faith scheme to negate its substantive contractual duty to contribute a portion of its profits to fund the benefits of its retirees. No fair reading of a provision governing the resolution of disputes about the “information or calculations” disclosed by the company comes close to encompassing such a claim. Therefore, I would hold that § 8.4 cannot be applied to require the SBC to submit its claim to arbitration.
III.
Even under the majority’s premise that the dispute is arbitrable, I would find that Navistar waived its right to require arbitration by its purposeful delay in raising the issue. Both prongs of our Court’s waiver inquiry — inconsistency with reliance on arbitration and actual prejudice— are met in this case. See Hurley v. Deutsche Bank Trust Co. Americas, 610 F.3d 334, 338 (6th Cir.2010).
This Court has explained that the first factor, inconsistency with reliance on an agreement to arbitrate, “typically involves a defendant’s failure to timely invoke arbitration after being sued or its interference with a plaintiffs pre-litigation efforts to arbitrate.” JPD, Inc. v. Chronimed Holdings, Inc., 539 F.3d 388, 393 (6th Cir.2008) (citing Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc., 350 F.3d 568, 574 (6th Cir.2003)). In Hurley, this Court found waiver where the defendants “consistently and actively litigated [the] action in court,” not only responding to the plaintiffs motions but also filing “multiple dispositive and non-disposi-tive motions of their own, including motions to dismiss, motions for summary judgment, and a motion to change venue.” 610 F.3d at 339. We noted that “[b]y filing a motion to change venue, [defendants proactively selected the forum in *835 which they wished to defend against [pjl'aintiffs’ claims.” Id. at 339. We additionally observed that, as in other cases where waiver was found, the defendants “did not attempt to enforce their arbitration rights until after the district court entered an unfavorable decision.” Id.
Navistar’s conduct is comparable. The SBC moved to intervene in the Shy litigation on March 23, 2012. Three days later, on March 26, the SBC filed its motion to enforce the settlement agreement. The supporting memorandum clearly notified the court and Navistar of the nature of the dispute. Namely, the SBC contended that Navistar was violating the PSP and the Shy Agreement by its failure to timely make its required disclosures, its refusal to respond to the SBC’s information requests, and, as the SBC asserted it had “reason to believe,” by “intentionally manipulating the placement of revenues and costs in its various business units in a manner that, if true, is wholly inconsistent with the intent of the Settlement Agreement.” (R. 395-1, Motion to Enforce, PGID 1117.) The motion thus put Navis-tar squarely on notice of the nature of the dispute and provided the company with a basis to seek arbitration.
Rather than rely on its right to arbitrate, Navistar deliberately avoided raising the issue. First, Navistar moved to defer any response to the motion to enforce until after the district court ruled on whether the SBC’s intervention was proper. Next, Navistar opposed the SBC’s intervention arguing, inter alia, that if the SBC had a cognizable legal claim “there is absolutely no reason why such a claim could not be asserted in a separate action.” (R. 404, Response, PGID 1734.) Navistar also alluded multiple times to the possibility of an “independent action” in the section of its opposition memorandum arguing that the SBC had other “adequate means for asserting its rights.” (Id. at 1735.) If ■Navistar intended to invoke its right to arbitrate, these assertions were disingenuous. Indeed, Navistar’s argument that the SBC should initiate a separate court action cannot be distinguished in substance from the efforts of the defendants in Hurley to “proactively select[] the forum in which they wished to defend against [plaintiffs’ claims.” 610 F.3d at 339.
Significantly, as the district court found, Navistar’s failure to raise arbitrability in opposing the motion to intervene is comparable to Johnson Associates Corp. v. HL Operating Corp., 680 F.3d 713 (6th Cir.2012), where we found that the defendant’s failure to raise arbitration as an affirmative defense showed an “intent to litigate rather than arbitrate.” Id. at 718. We explained that “as a practical matter, an enforceable contractual right to compel arbitration operates as a quasi-jurisdictional bar to a plaintiffs claims, providing grounds for dismissal of the suit.” Id. The quasi-jurisdictional nature of an enforceable arbitration clause is just as pertinent at the motion to intervene stage because, “as a practical matter,” if a party’s claim must be arbitrated there is no basis for that party to intervene in the action. See id. The majority attempts to distinguish Johnson Associates by arguing that Navis-tar’s failure to raise arbitrability merely implied “a desire to raise all defenses, including arbitration, in the context of fresh litigation.” Maj. Op. at 830. This is not only unpersuasive — neither Navistar nor the majority can identify any sound legal purpose for deferring its request for arbitration to “fresh litigation” — -it is also inconsistent with the practical inquiry that governs the waiver analysis under Johnson Associates. See 680 F.3d at 718.
Contrary to the majority’s suggestion, Navistar’s delaying tactics did not end once the district court approved the SBC’s intervention on February 6, 2013. On March 11, 2013, Navistar filed its response *836 to the SBC’s motion to enforce the settlement agreement and its first motion to dismiss. For the first time, both documents cited to the dispute resolution clause of the PSP; neither document, however, argued that § 8.4 was a binding arbitration clause, or even mentioned the word “arbitration.” It is impossible to understand how Navistar could have failed to request enforcement of the Federal Arbitration Act at this juncture if it truly intended to rely on its right to arbitrate.[1] Navistar’s failure to forthrightly press the issue in these substantive filings clearly telegraphs an “intent to litigate rather than arbitrate.” Johnson Associates, 680 F.3d at 718.
Moreover, Navistar’s decision to oppose the SBC’s motion to enforce and to file a motion to dismiss without clearly invoking its right to compel arbitration entailed further unwarranted delay and unnecessary litigation comparable to the circumstances in Hurley, where the defendants responded to the plaintiffs motions and filed “multiple dispositive and nondispositive motions” before requesting arbitration. See 610 F.3d at 338-39. Only after the district court granted in part the SBC’s motion to enforce and ordered Navistar to disclose the information requested, and after the SBC used that information to file an amended complaint that detailed in over twenty pages the various ruses used to shield profits from the SBC and the Supplemental Plan — only then did Navistar seek to compel arbitration. Under Sixth Circuit precedent, a party that persists in litigation until the tide begins to turn against it has waived its right to require arbitration under an otherwise valid arbitration clause. Id. at 339.
Though our precedent compels a finding of waiver based on Navistar’s litigation conduct alone, the company’s strategy of delay and avoidance is also apparent from its pre-litigation interference with the SBC’s attempts to arbitrate. Navistar may have had a valid reason for declining arbitration in 2009 regarding the Medicare Part D subsidy, but the same cannot be said for its complete failure to respond to the May 2010 letter, which raised a broader set of issues that previewed the full dispute now at issue. The majority characterizes Navistar’s year long silence as “concerning” but ultimately acceptable as “typical posturing” under Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc., 350 F.3d 568, 574 (6th Cir.2003). In Highlands Wellmont, however, the parties “were in a discussion stage about their respective claims and their positions” and the defendant stated that it would decline “ ‘at [that] point’ ” to engage in arbitration. Id. at 574 (editing in original). The majority opinion distorts the rationale of Highlands Wellmont by applying it in these circumstances. Rather than reasonably accounting for the nature of back-and-forth between potentially adverse parties, as the Court did in Highlands Wellmont, the majority in the instant case condones obstruction and unjustifiable avoidance. I would hold that total failure to respond to a timely noticed *837 dispute constitutes interference with a plaintiffs efforts to arbitrate rising to the level of waiver. See JPD, Inc. v. Chronimed Holdings, Inc., 539 F.3d 388, 393 (6th Cir.2008).
Finally, Navistar’s delay has caused the SBC “actual prejudice.” Hurley, 610 F.3d at 338. The majority incorrectly asserts that Navistar raised arbitration in “its second substantive submission in the litigation.” Maj. Op. at 829-30. In fact, Navistar waited until its fourth substantive submission to raise the issue, sitting quietly on its arbitration rights while the parties litigated the SBC’s right to intervene, the SBC’s motion to enforce the settlement agreement, and Navistar’s initial motion to dismiss. These litigation costs, though not as extreme as some cases, are sufficient to qualify as actual prejudice under our precedent. Compare Johnson Associates Corp., 680 F.3d at 720 (affirming district court’s finding of waiver where “plaintiffs were prejudiced by unnecessary delay and expense because ‘the right to arbitrate was not asserted for eight months, during which motions were filed, requests for discovery materials were made and responses were prepared, and a judicial settlement conference was held.’ ”).
CONCLUSION
In sum, I would hold that the instant dispute is not within the scope of the arbitration clause, and that even if the dispute were arbitrable, Sixth Circuit precedent compels a conclusion that Navistar waived its right to demand arbitration. I therefore respectfully dissent.

. The majority avoids addressing the misleading nature of Navistar's argument, instead simply asserting that Navistar’s briefing was “sufficient to invoke arbitration.” Maj. Op. at 829, n. 1. It appears that the briefing at this stage was not, however, sufficient to alert the SBC or the district court to the nature of Navistar's request, since neither the SBC’s replies nor the district court addressed Navis-tar’s argument regarding the alternative dispute resolution clause as an arbitration issue governed by the Federal Arbitration Act. That the district court later, in hindsight, recognized the arbitration issue hidden in Navis-tar’s reference to § 8.4 does not take away from the fact that Navistar’s conduct was both misleading and inconsistent with any good faith intention to rely on its right to arbitrate.